## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

HOUSING OPPORTUNITIES MADE EQUAL, INC.,

        Plaintiff,

v.

BUFFALO MANAGEMENT GROUP, INC.,
90 HUNTINGTON ASSOCIATES, INC., and
MYRON ROBBINS,

        Defendants.

Civil Action No. _____

**COMPLAINT**

Jury Trial Demanded

## NATURE OF ACTION

1.      "I don't know what you would do with children [in The Elliott Apartments] . . . I've been doing this for 40+ years . . . We've never had a child in it . . . These are all buildings of professional adults. It's not a family setting." Myron Robbins, owner and manager of Buffalo Management Group, knowingly, intentionally, and willfully denies families with children their fundamental and well-established right to choose where they live, in violation of federal and state fair housing laws.

2.      In this case, prospective renters with children wanted to live in Defendants' apartment buildings in the Medical Corridor in Buffalo, NY, but Defendants took steps to keep families out of their buildings. Defendants ignored their calls, screened them out, and if prospective renters with children toured an apartment, they were discouraged or outright denied the opportunity to rent in Defendants' "professional" buildings because Buffalo Management

Group "is all into young professionals and graduate students," not families with children.[1]

3.      This form of discrimination—known as familial status discrimination—has been illegal for many years. Over three decades ago, Congress and the State of New York banned these discriminatory practices to protect families against housing discrimination simply because they had children in the household.

4.      Given the long-established prohibition on familial status discrimination, all rental agents operating rental housing in the Buffalo metropolitan region know or should know that discrimination against families with children in housing is unlawful and punishable under state and federal law.

5.      Plaintiff Housing Opportunities Made Equal, Inc. (HOME) brings this action against Defendants Buffalo Management Group (BMG), 90 Huntington Associates, Inc., (Huntington) and Myron Robbins (Robbins) for declaratory, injunctive, and monetary relief from their unlawful housing discrimination in violation of federal and state fair housing laws.

6.      In this case, HOME asks the Court to enforce the well-established legal rights of families with children to equal treatment in rental housing. HOME brings this case after discovering Defendants' widespread policy or practice of discriminating against families with children.

7.      Defendants have a policy or practice of denying housing to families with children. Defendants tells prospective renters that their "professional" buildings are "not suited for children" and their desirable residential apartments in the Medical Corridor "are all buildings of

---

[1] In this Complaint, Plaintiff uses the term "children," to mean more than one child. It is not intended to limit the factual allegations or claims upon which relief can be granted. As detailed in the factual allegations, the testing evidence reveals that Defendants used a variety of strategies to treat families with *one or more* children differently. It appears that sometimes Defendants allowed one child in a rental unit, but not two. In other instances, it appears Defendants screened out all families with any children from their buildings. Defendants' practices may vary based on the building. Regardless of which practice Defendants employed at a given time, all such discriminatory practices violate federal and state fair housing laws.

professional adults. It's not a family setting."[2]

8.      Defendants routinely engage in at least three unlawful practices in violation of federal and state fair housing laws: (1) They intentionally screen out families with children by asking prospective adult renters whether they have children and how many before scheduling an apartment showing or choosing not to call the families back; (2) they unequivocally tell prospective renters that Defendants don't rent to families in Defendants' "professional" apartments in desirable neighborhoods in the City of Buffalo; and (3) they unlawfully steer families with children to rentals in other parts of the metropolitan region, often to lower-opportunity areas with less desirable amenities. Individually and collectively, these practices violate federal and state fair housing laws.

9.      This is not a case of one bad employee "going rogue." Defendants follow a company-wide policy established by BMG owner and manager Myron Robbins, who is actively involved in daily operations, and enforced by employees and agents at all levels of management. Magnifying its effect, these policies or practices are especially egregious because BMG is a large rental and property management company with hundreds of rental units in the Buffalo metropolitan region. In addition to violating prohibitions against familial status discrimination, these policies or practices have an adverse and disparate impact on families with children and female-headed households, and unlawfully perpetuate segregation of families with and without children, which is also prohibited by federal and state fair housing laws.

---

[2] The Medical Corridor is the area surrounding the Buffalo Niagara Medical Campus. It features a variety of desirable amenities and necessities for residents, including proximity to the hospitals, medical research facilities, public transit, restaurants, a grocery store, public parks, entertainment, and other public accommodations. *See, e.g.*, The District, Buffalo Niagara Medical Campus, https://bnmc.org/the-district/.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this matter under 42 U.S.C. § 3613, 28 U.S.C. § 1343, and 28 U.S.C. § 1331.

11.    This Court has supplemental jurisdiction over the state law claims because they are so related to Plaintiff's federal claims that they form part of the same case or controversy. 28 U.S.C. § 1367.

12.    There are no administrative prerequisites to the filing of this action.

13.    The complaint is timely, as filed within the two-year (FHA) and three-year (NY Human Rights Law) statutes of limitations periods, respectively.

14.    Venue is proper under 28 U.S.C. § 1391(b) because Defendants reside and conduct business in this district, and the events giving rise to the claims occurred in this district.

## PARTIES

15.    Plaintiff, Housing Opportunities Made Equal, Inc. (HOME), is a nonprofit corporation organized under the laws of the State of New York with its principal place of business at 1542 Main Street, Buffalo, NY 14209. Its mission is to promote the value of diversity and ensure all people have an equal opportunity to live in housing and communities of their choice. HOME pursues its mission through core business activities related to fair and equal access to housing, including its housing mobility programs, housing counseling and referral services, public outreach and trainings, fair housing investigations into reported incidents of discrimination, client advocacy, and support services for victims of discrimination.

16.    Pursuant to its mission, HOME engages in governmental contracts to conduct fair housing testing and commence enforcement proceedings, under the federal Fair Housing Initiatives Program (FHIP Program), 42 U.S.C. § 3616a, which authorizes "testing" to "discover

and remedy discrimination," 42 U.S.C. § 3616a(b)(2)(A)–(B). Congress's FHIP Program is designed to eradicate housing discrimination, which is "a policy that Congress considered to be of the highest priority."[3]

17.    HOME also provides contractual fair housing services for New York state and local governments, including public outreach and public education services.

18.    Defendant Buffalo Management Group, Inc. (BMG) is a privately owned domestic business corporation registered with the State of New York headquartered and operating in Buffalo, NY, and the surrounding metropolitan region. It acquires, develops, markets, and leases multifamily residential properties. Its registered place of business is 230 North Street, Buffalo, NY, 14201.[4]

19.    Defendant 90 Huntington Associates, Inc. (Huntington) is a privately owned domestic business corporation registered with the State of New York headquartered in Williamsville, NY, and operating in Buffalo, NY, and the surrounding metropolitan region. It owns several properties managed by BMG. Its registered place of business is 235 Ranch Trail West, Williamsville, NY 14221.[5] Its registration identifies Defendant Myron Robbins as its CEO.[6]

---

[3] *See Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 211 (1972) (recognizing the elimination of housing discrimination as a policy priority); *see also Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.,* 576 U.S. 519, 539 (2015).
[4] New York Department of State, Division of Corporations, Entity Search, available at https://apps.dos.ny.gov/publicInquiry/EntityDisplay (listing "Buffalo Management Group" as a Domestic Business Corporation, DOS ID 2913117).
[5] New York Department of State, Division of Corporations, Entity Search, available at https://apps.dos.ny.gov/publicInquiry/EntityDisplay (listing "90 Huntington Associates, Inc." as a Domestic Business Corporation, DOS ID 2963683).
[6] *Id.*

20.     Individual Defendant Myron Robbins (Robbins) is a natural person who conducts business in Buffalo, NY, as the owner and manager of Defendant BMG. He is registered with the State of New York as the agent of service for BMG at 230 North Street, Buffalo, NY 14201.

21.     According to BMG's website, Robbins is "active in the day-to-day operations of the company."[7] He is also registered with the State of New York as the CEO of Defendant Huntington at 230 North Street, Buffalo, NY 14201.

22.     BMG operates and manages properties owned by Robbins and Huntington.

23.     Robbins is the CEO of Huntington and owner and manager of BMG.

24.     Each Defendant, at all relevant times, acted as the agent and on behalf of the others with regards to all activities alleged in this complaint.

25.     All Defendants are jointly and severally liable for the wrongful acts alleged herein.

---

[7] Buffalo Management Group: About, https://buffalomanagementgroup.com/about/.

## FACTUAL ALLEGATIONS

### *Housing Discrimination Against Families with Children*

26.     The Fair Housing Act (FHA) is the federal government's most comprehensive law against housing discrimination. 42 U.S.C. § 3601 *et seq.* It prohibits unlawful discrimination and unequal treatment based on seven protected classes: race, color, national origin, religion, sex, disability, and familial status. 42 U.S.C. § 3604. It makes it unlawful:

(a)     To refuse to sell or rent … or negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of … familial status.

(b)     To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of … familial status…. [and]

(d)     To represent to any person because of … familial status … that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available. *Id*. at § 3604(a), (b), (d).

27.     Protections for families with children, enacted decades ago, marked an important evolution in fair housing law. In the Fair Housing Act of 1968, Congress prohibited discrimination based on race, color, national origin, and religion. In 1988, Congress responded to evidence of widespread discrimination against families and the resulting family homelessness by amending the FHA to include familial status as a protected class.[8]

28.     The FHA defines "familial status" as one or more persons under the age of eighteen living with a parent or designee of a parent. 42 U.S.C. § 3602(k).

---

[8] House Comm. on the Judiciary, Fair Housing Amendments Act of 1988, H.R. Rep. No. 100-711, at 19 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2180 (discussing the severity of the problem of discrimination against families with children and its consequences); *see also Bank of Am. Corp. v. City of Miami,* 581 U.S. 189, 198–99 (2017) (quoting with approval the House Report).

29.     Familial status protections "shall also apply to any person who is pregnant or is in the process of securing legal custody of any individual who has not attained the age of 18 years." 42 U.S.C. § 3602(k).

30.     Under the FHA, it is "unlawful, because of . . . familial status . . . to restrict or attempt to restrict the choices of a person by word or conduct in connection with seeking, negotiating for, buying or renting a dwelling so as to perpetuate, or tend to perpetuate, segregated housing patterns, or to discourage or obstruct choices in a community, neighborhood or development." 24 C.F.R. § 100.70(a).

31.     Prohibited activities that are unlawful steering practices include "discouraging any person from inspecting, purchasing or renting a dwelling because of . . . familial status . . . or because of the . . . familial status . . . of persons in a community, neighborhood or development" and "communicating to any prospective purchaser that he or she would not be comfortable or compatible with existing residents of a community, neighborhood or development because of . . . familial status." 24 C.F.R. § 100.70(c)(1)–(c)(3).

32.     The New York Human Rights Law prohibits housing discrimination against families with children. N.Y. Exec. Law § 296(5)(a). Specifically, it makes it an "unlawful discriminatory practice" for any person to "[r]efuse to sell, rent, lease or otherwise to deny to or withhold from any person or group of persons such a housing accommodation because of . . . familial status of such person or persons, or to represent that any housing accommodation or land is not available for inspection, sale, rental or lease when in fact it is so available." N.Y. Exec. Law § 296(5)(a)(1).

33.    The NY Human Rights Law also prohibits "discriminat[ion] against any person because of . . . familial status in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or in the furnishing of facilities or services in connection therewith." N.Y. Exec. Law § 296(5)(a)(2).

34.    Given this long-established prohibition on familial status discrimination at the federal and state levels, all rental agents operating rental housing in the Buffalo metropolitan region know or should know that discrimination against families with children in rental housing is unlawful and punishable under state and federal law.

### *How Discrimination Affects Children*

35.    Family homelessness has been such a significant problem in the United States that it prompted a bipartisan effort in Congress to prohibit discrimination against families with children. Congress "carefully crafted" this amendment to protect "single-parent families, young families with children, and poor families . . . without placing an undue burden on owners and landlords."[9] The need for fair housing enforcement remains. Families with children continue to experience homelessness at high rates. Today, they account for approximately 30% of the homeless population in the United States.[10]

36.    Discrimination against families with children increases rates of homelessness. When a person or family experiences homelessness, it can cause irreparable physical, mental, and financial harm.

37.    Familial status discrimination harms all types of families, including so-called

---

[9] *See* Tim Iglesias, *Moving Beyond Two-Person-Per-Bedroom: Revitalizing Application of the Federal Fair Housing Act to Private Residential Occupancy Standards*, 28 GA. ST. U. L. REV. 619, 629 (2013) (quoting legislative history).
[10] ANNUAL HOMELESSNESS ASSESSMENT REPORT CONGRESS, U.S. DEP'T OF HOUS. AND URBAN DEVELOPMENT 2 (2023), www.huduser.gov/portal/sites/default/files/pdf/2023-AHAR-Part-1.pdf.

"professionals" with children seeking to rent in a desirable neighborhood like the Medical Corridor.

38.     Defendant BMG routinely tells prospective renters that Defendants' "professional" buildings in the Medical Corridor are "not suited for children" and are "not a family setting." This ignores the fact that "professionals" have children too and are equally deserving of housing in the same neighborhoods and buildings as those without children. It is unlawful to differentiate between prospective renters based on whether they have children, regardless of whether a landlord believes their property is well-suited for "professionals."

39.     Upon information and belief, BMG has operated for over 30 years.[11] BMG owns or operates at least 28 properties, amounting to hundreds of rental units throughout Buffalo and the surrounding region, making it one of the largest landlords in Western New York. As such, BMG's practices have substantial implications. Its practices pose significant harm to families with children and the greater community.

### Fair Housing Testing

40.     The primary way that fair housing nonprofits across the country like HOME investigate fair housing complaints is through "paired" fair housing testing. The U.S. Supreme Court has approved this longstanding method of paired testing to document discriminatory conduct.[12]

41.     Testers are trained by nonprofits or government agencies that conduct fair housing testing to pose as prospective renters. They are trained to ask specific questions that are

---

[11] *See* Buffalo Management Group: About, https://buffalomanagementgroup.com/about/.
[12] *See, e.g.*, Paired Testing, The Urban Institute, www.urban.org/research/data-methods/data-analysis/quantitative-data-analysis/impact-analysis/paired-testing; *see also* Havens Realty Corp. v. Coleman, 455 U.S. 363, 373 (1982) (affirming that testers have standing to sue).

designed to reveal unlawful discriminatory treatment.

42.     Paired testing involves assigning two or more trained testers fictitious identities and qualifications that are comparable in all respects, except on one key characteristic—the protected status being tested—such as race or familial status (*e.g.*, children or no children). Each tester contacts the landlord about the same housing unit and documents the interaction. The nonprofit or government agency commissioning the testing then studies the results. Testing results that indicate a difference in treatment may be used as evidence of discrimination in later-filed enforcement actions like administrative complaints and lawsuits.

43.     In this case, the testers inquired about available units in Defendants' properties. Testers communicated with Defendants by: (1) Telephone calls; (2) in-person visits to the rental units; and (3) text messaging. The tests were designed to determine if Defendants treated prospective renters differently depending on whether they had children.

44.     For each test conducted by HOME, one tester assumed a fictitious identity as a person with children (Protected Status Tester) and a second tester posed as a person without children (Control Tester).

45.     A single "test" often consists of multiple contacts, including a screening telephone call in which the tester expresses an interest in the apartment and the housing provider's agent asks questions and supplies additional information. Additional contacts may include follow-up calls, text messages, or in-person showings of the apartment unit. Thus, a single "test" may span multiple days or weeks. When there is a gap between tests, such as Test 1 (November 2022) and Test 2 (January 2023), that is typically because tests can only be conducted when Defendants advertise a new vacancy that fits the parameters of the test.

***Defendants' Discriminatory Practices***

*Overview of the Evidence*

46.    HOME conducted an initial test (Test 1) in late November 2022, which revealed a difference in treatment based on familial status. HOME then further investigated for any BMG policy or practice of discriminating against families with children and the full extent of potential discriminatory conduct.

47.    HOME initiated a formal investigation and assigned additional testers to gauge the existence, nature, and extent of BMG's discriminatory policies and practices. (**Table 1.**) Testing uncovered a series of admissions proving that BMG has a policy of discriminating against families with children.

48.    HOME's investigation uncovered that BMG discriminated against prospective renters based on familial status in at least three ways: (1) Screening out families with children by asking prospective renters whether they have children, then refusing to schedule apartment showings to families with children; (2) unequivocally telling prospective renters they don't rent to families; and (3) steering prospective renters with children to units in other neighborhoods or municipalities outside the Medical Corridor (*i.e.*, North Buffalo and the Town of Tonawanda). Altogether, these policies and practices amount to either refusing to rent, refusing to deal, or otherwise denying housing to families with children and/or treating families with children differently. Additionally, these policies and practices separate families with children from individuals without children, unlawfully steering and perpetuating the separation or segregation of families from people without children.

49.    HOME's investigation revealed that Defendants engaged in a continuing violation of the federal Fair Housing Act and the NY Human Rights Law through a policy or

practice of discriminating against families with children, carried out by Myron Robbins and reinforced by his employees and agents at all levels of management.

50.    Myron Robbins personally established and carried out BMG's policy or practice of discriminating against families with children. Accordingly, all references in this Complaint to Defendant BMG's policy or practice are also intended as allegations that Myron Robbins maintained the same policy or practice, and that BMG and Myron Robbins were one and the same for all purposes relevant to this complaint.

**Table 1. Overview of Testing Evidence**

| Test | Test Date Range | Protected Status Tester | Control Tester | BMG Agents | Building(s) Tested |
|------|-----------------|-------------------------|----------------|------------|---------------------|
| 1 | 11/17/22-11/30/22 | D.W. | V.O. | Techelle | The Elliott Apartments |
| 2 | 1/9/23-1/21/23 | A.W.C. | S.A. | Techelle, Jeremy | The Elliott Apartments |
| 3 | 3/9/23-3/17/23 | N.S. | M.N. | Reena, Victor, Jeremy, and Myron Robbins | The Delaware Apartments, The Mayflower Apartments |
| 4 | 3/30/23-4/4/23 | J.H. | B.C. | Techelle, Jeremy, Myron Robbins | The Elliott Apartments |

*Test 1 (November 2022)*

51.    In late November 2022, HOME conducted a fair housing test of BMG's property at 171-175 Linwood Avenue, Buffalo, NY 14209 (hereinafter The Elliott Apartments).

52.    The test involved two testers: Protected Status Tester D.W., a single woman with two daughters (ages 5 and 8), and Control Tester V.O., a single woman without children. Both testers called BMG to inquire about an available unit and schedule an apartment viewing.

53.    On November 18, 2022, Protected Status Tester D.W. contacted BMG to inquire

about a two-bedroom apartment. A BMG representative, who identified herself as Techelle, told Protected Status Tester D.W. to apply online and that someone from BMG would call her if she qualified for the apartment.

54.     On November 22, 2022, Protected Status Tester D.W. called BMG again. She stated she did not feel comfortable putting her personal information online and asked to see the apartment in person before applying.

55.     Techelle agreed to conduct the pre-screening with Protected Status Tester D.W. over the phone.

56.     During the pre-screening, Protected Status Tester D.W. disclosed that she would be moving into the apartment with her two daughters.

57.     Techelle told Protected Status Tester D.W. that she would forward Protected Status Tester D.W.'s information to her manager and that someone would call Protected Status Tester D.W.

58.     On November 30, 2022, after more than one week of no contact, Protected Status Tester D.W. called BMG again to inquire if she qualified for the apartment.

59.     Techelle answered the phone again and told Protected Status Tester D.W. that she could not find Protected Status Tester D.W.'s information and that the information was likely with the manager and that she would call Protected Status Tester D.W.

60.     Nearly two weeks after this phone call, Protected Status Tester D.W. still had not received a response from BMG.

61.     The lack of follow-up was intended to discourage Protected Status Tester D.W., a prospective renter with children, from living in the apartment.

62.     In contrast, Control Tester V.O. was told by a BMG representative, who did not

disclose their name, during the pre-screening call on November 17, 2022, that she qualified for the apartment.

63.     Control Tester V.O viewed an apartment on November 28, 2022, with Techelle, and was provided with an application for the apartment after viewing.

64.     Given the discriminatory treatment, HOME flagged this test as evidence of a possible pattern of discrimination and scheduled follow-up tests.

*Test 2 (January 2023)*

65.     On January 9, 2023, Protected Status Tester A.W.C., posing as a single woman with two sons (ages 3 and 4), called BMG and inquired about the availability of a two-bedroom apartment at the Elliott Apartments.

66.     The BMG representative, who identified herself as Techelle, asked Protected Status Tester A.W.C. who would be occupying the apartment.

67.     Protected Status Tester A.W.C. disclosed it would be A.W.C. and her two sons.

68.     Techelle replied she would have to check with a manager because they [BMG] typically do not allow more than two people in a two-bedroom apartment.

69.     Protected Status Tester A.W.C. stated her sons would share a bedroom. Techelle told the Protected Status Tester A.W.C. she would call her back after talking to her manager.

70.     Protected Status Tester A.W.C. did not receive a return call.

71.     On January 10, 2023, Protected Status Tester A.W.C. called BMG again and spoke with a different BMG representative, who identified himself as Jeremy.

72.     Jeremy affirmatively told Protected Status Tester A.W.C. they [BMG] do not allow more than two people to reside in a two-bedroom apartment.

73.     These statements were intended to discourage and deny Protected Status Tester

A.W.C. from living in this apartment.

74.     In contrast, Control Tester S.A., posing as a single woman without children, called BMG on January 13, 2023, to inquire about available apartments at the Elliott Apartments.

75.     Techelle asked Control Tester S.A. a series of pre-screening questions and informed Control Tester S.A. that she qualified.

76.     Control Tester S.A. scheduled an appointment to view the apartment for January 21, 2023.

*Test 3 (March 2023)*

77.     On March 9, 2023, Protected Status Tester N.S., posing as a pregnant, single woman with one daughter (age 4), called BMG and spoke with BMG representative Techelle. Protected Status Tester N.S. inquired about the availability of a two-bedroom apartment at 905 Delaware Avenue, Buffalo, NY 14209 (hereinafter the Delaware Apartments).

78.     On March 13, 2023, Protected Status Tester N.S. called BMG again to ask whether she could get pre-qualified in another way besides the website.

79.     The BMG representative, who identified herself as Reena, asked Protected Status Tester N.S. who would be occupying the apartment.

80.     Protected Status Tester N.S. disclosed it would be N.S. and her daughter.

81.     Reena clarified that Protected Status Tester N.S. only had one child before proceeding with the rest of the pre-screen.

82.     Protected Status Tester N.S. did not disclose her pregnancy on the phone.

83.     Reena finished the pre-screen with Protected Status Tester N.S. and informed her that she qualified.

84.    Protected Status Tester N.S. scheduled a viewing of two two-bedroom apartments at 66 Summer Street, Buffalo, NY 14209 (hereinafter the Mayflower Apartments).

85.    Reena did not inform Protected Status Tester N.S. of availability at the Delaware Apartments, the building in which the tester initially expressed interest.

86.    On March 15, 2023, at the apartment viewing, the BMG representative, who identified himself as Victor, immediately commented on Protected Status Tester N.S.'s pregnancy and asked when Protected Status Tester N.S. was due.

87.    Victor asked Protected Status Tester N.S.: "Is this your first child?" and "How old is your first [child]?".

88.    Throughout the apartment viewing, Victor asked Protected Status Tester N.S. if she was "sure you wanna live in Buffalo?" and emphasized that "this is a transition. An eight-story building from something in the suburbs."

89.    Victor also discussed the building's security features in depth, experiences with packages being stolen, and that the police response to stolen packages was minimal ("if you're not shooting somebody or robbing a bank or raping somebody there's nothing they [the police] will do").

90.    Defendants' statements were intended to discourage Protected Status Tester N.S. from living in this apartment.

91.    On March 18, 2023, a few days after the apartment viewing, Protected Status Tester N.S. called BMG to inquire about how to apply for the apartments she toured.

92.    Protected Status Tester N.S. spoke with Defendant Myron Robbins, who asked Protected Status Tester N.S. how old her child was and then inquired about Protected Status Tester N.S.'s childcare arrangements.

93.     Robbins directed Protected Status Tester N.S. to the BMG website for apartment availability and pricing, but did not direct her to submit an application or provide instructions on how to complete the online application.

94.     On March 15, 2023, Control Tester M.N., posing as a married man without children, called BMG to inquire about available apartments at the Delaware Apartments.

95.     Techelle asked Control Tester M.N. a series of pre-screening questions and informed Control Tester M.N. he and his wife qualified.

96.     Control Tester M.N. was able to schedule a same day appointment to view the apartment at the requested building. Control Tester M.N. toured the apartment.

97.     On March 16, 2023, Control Tester M.N. called BMG to inquire about how to apply for the apartments he toured.

98.     BMG representative Jeremy asked if the apartment was just for Control Tester M.N. Control Tester M.N. confirmed the apartment was for Control Tester M.N. and his wife, then received instructions on how to complete the online application.

*Test 4 (March–April 2023)*

99.     On March 31, 2023, Protected Status Tester J.H., posing as a single woman with two sons (ages 7 and 12), called BMG to inquire about the availability of a two-bedroom apartment at the Elliott Apartments.

100.    BMG representative Techelle disclosed that three two-bedroom apartments were currently vacant.

101.    Techelle asked a series of pre-screening questions, including who would be occupying the apartment.

102.    Protected Status Tester J.H. disclosed that it would be J.H. and her two sons.

18

Techelle asked for the sons' ages and replied, "I have to pass this along to my manager because he would have to approve three of you living in a two-bedroom. I know it sounds silly, but that's how he is."

103.  Protected Status Tester J.H. called BMG to follow up the same day and spoke with the manager, BMG representative Jeremy.

104.  Jeremy informed Protected Status Tester J.H. that the other BMG representative (Techelle) had not called him yet, then told Protected Status Tester J.H. to call again on Monday, rather than offering to call Protected Status Tester J.H. back.

105.  On April 3, 2023, Protected Status Tester J.H. called BMG as requested and spoke to Techelle again.

106.  Techelle stated she had not spoken to Jeremy yet, then asked Protected Status Tester J.H. to confirm she was interested in the apartments located in Tonawanda, NY.

107.  Protected Status Tester J.H. corrected Techelle and stated she was interested in the apartments at the Elliott Apartments.

108.  Techelle again stated it was "tricky" because "[Myron Robbins] likes a certain amount of people in two bedrooms. With the two kids, he wants them to have separate bedrooms. It might be a little bit too small."

109.  Techelle promised to call Protected Status Tester J.H. back the following day.

110.  By 3:00 p.m. the following day, April 4, 2023, Protected Status Tester J.H. still had not received a return call from Techelle.

111.  On the afternoon of April 4, 2023, Protected Status Tester J.H. called and spoke to Techelle again who stated she had talked to the owner (referring to Defendant Myron Robbins) and "usually he likes to have two people per unit."

19

112.  Protected Status Tester J.H. confirmed this meant she would not be able to schedule an apartment viewing.

113.  Techelle stated she would call the owner again and call Protected Status Tester J.H. back.

114.  Shortly after, Robbins called Protected Status Tester J.H. on the telephone.

115.  Robbins told Protected Status Tester J.H. "[w]e don't get many family groups of people looking for apartments in buildings that cater to young professionals or doctors" and "[t]here's no children in these buildings . . . There's no yard. There's no way for children from another address to approach your children. I know what you need. You need a nice flat or apartment, maybe like a two-family, a home-like setting."

116.  Robbins also said Techelle should have told Protected Status Tester J.H. that this building "[is] not safe for children."

117.  Robbins then stated, "I don't know what you would do with children there. You'd have to take them with you when you go in and out. I've been doing this for 40+ years. We've owned the Elliott for 30+ years. We've never had a child in it. There's three buildings: the Mayflower, the Elliott, and the Bryant. These are all buildings of professional adults. It's not a family setting."

118.  Robbins continued to reiterate to Protected Status Tester J.H. that BMG "is all into young professionals and graduate students" and her desired housing area was not suited for children.

119.  Robbins then advised Protected Status Tester J.H. to consider North Buffalo or the Town of Tonawanda for her housing search ("You might even find a small house there you can rent.").

120.  This statement was intended to and/or had the effect of discouraging Protected Status Tester J.H. from renting this apartment.

121.  In contrast, Control Tester B.C., posing as a single woman without children, called BMG on March 30, 2023, to inquire about available two-bedroom apartments at the Elliott Apartments.

122.  Techelle asked Control Tester B.C. a series of pre-screening questions and informed Control Tester B.C. she qualified. Control Tester B.C. scheduled an appointment to view the apartment.

123.  On April 3, 2023, Control Tester B.C. toured two two-bedroom apartments with Techelle. Techelle provided Control Tester B.C. with information about how to complete an application.

### *Occupancy Standards*

124.  Sometimes landlords use occupancy standards as a pretext for discrimination against families with children, telling prospective renters that the unit is too small for their family size. This is a problem Congress specifically acknowledged when it amended the Fair Housing Act to protect families with children.[13]

125.  This case, however, is not about occupancy standards. The testing evidence demonstrates that Defendants did not rely on government occupancy standards to exclude large families based on a case-by-case calculation of square footage per person for each unit. On the contrary, Defendants made blanket statements explaining that they did not want children in their "professional" buildings. This is a case of explicit, intentional discriminatory treatment.

---

[13] *See* Tim Iglesias, *Moving Beyond Two-Person-Per-Bedroom: Revitalizing Application of the Federal Fair Housing Act to Private Residential Occupancy Standards* 28 Ga. St. U.L. Rev. 619, 629 (2013); *see also* ROBERT G. SCHWEMM, HOUSING DISCRIMINATION AND LAW LITIGATION § 11E:3 (July 2024).

126.  Even if Defendants had relied on occupancy standards to justify their discriminatory practices, the relevant government occupancy standards would not change the outcome in this case. Upon information and belief, all tested units easily exceed the minimum square footage requirements for the number of occupants presented in the tests. This Court should not allow Defendants to use occupancy standards as pretext for discrimination. Defendants knowingly and intentionally discriminated against families with children.

### *Statistical Evidence of Disparate Impact and Perpetuation of Segregation*

*Disparate Impact on Families (Familial Status) and Female-Headed Households (Sex)*

127.  In the Buffalo-Cheektowaga Metropolitan Area, there were 497,529 occupied housing units, and, within those, 125,177 family households with children under the age of 18 in the U.S. Census Bureau's American Community Survey (ACS) 5-Year Estimates 2018-2022 (Table A10009).  Of those households with children under 18 years of age, 77,316 (62%) were married-couple family households, 11,682 (9%) were single-parent households led by a man, and 36,179 (29%) were single-parent households led by a woman. (**Figure 1.**)

128.  Defendants' policy or practice has a discriminatory impact on households with a female head of household. Defendants' policy or practice predictably and actually disproportionately harms female heads of household (*i.e.* disproportionately affects women) because households with children in the Buffalo Metropolitan Area are more likely to have a female head of household than the relevant non-protected group, households without a female-headed household. Among single-parent households, a policy excluding households with children adversely affects women at **three (3.0) times the rate** than it affects men, a difference that is statistically significant using a t-test.

129.  Defendants' policy or practice does not have a substantial, legitimate,

nondiscriminatory objective and rather are artificial, arbitrary, and unnecessary barriers for families with children and female-headed households. Even if Defendants' policy or practice were to have some business purpose, less discriminatory alternatives are and have been available to Defendants to achieve those objectives.

*Segregation of Families with Children from People without Children*

130.    Patterns of familial segregation have and still do exist in the Census Tracts where Defendants' properties are located.

131.    Defendants' practices predictably and actually maintain, perpetuate, reinforce, or otherwise perpetuate created the segregated familial housing pattern.

132.    Defendants' practices forestall familial housing integration and freeze existing segregation patterns.

133.    The characteristics of the two Census Tracts containing the properties at issue in this case are substantially different from the Buffalo-Cheektowaga Metropolitan Area as a whole, the relevant rental market. In the two Census Tracts (006702 and 006602) in which Defendants' properties are located, only 10 percent of households have children under the age of 18, according to the U.S. Census Bureau's American Community Survey (ACS) 5-Year Estimates 2018-2022 (Table A10009). By comparison, in the Buffalo-Cheektowaga Metropolitan Area, 2.5 times as many households (twenty-five percent) have children under the age of 18, according to the U.S. Department of Commerce American Community Survey 5-Year Estimates 2018-2022 (Table A10009). (**Figure 2.**)

134.    The difference between the Census Tracts in which the Defendants' properties are located and the greater Buffalo-Cheektowaga Metropolitan Area is statistically significant, using a t-test.

135. Defendants' properties are highly desirable to some renters. The properties are located in high-opportunity neighborhoods convenient for burgeoning families with easy access to numerous neighborhood resources such as grocery stores, doctors, and safe playgrounds. By applying Defendants' practices, they act as gatekeepers, preventing such resources from being easily accessible to families with children.

136. By denying families with children, Defendants' policy or practice predictably and actually perpetuates familial segregation in violation of the FHA.

### *Harm to Organizational Plaintiff HOME*

137. Defendants have harmed Plaintiff HOME and the clients HOME serves. Defendants have interfered with and undermined HOME's core business activities. Additionally, Defendants' unlawful housing practices have frustrated HOME's mission of ensuring that all families have equal opportunities to fair housing. In response, HOME has engaged in a series of counteraction measures intended to address the harm caused by Defendants' intentional and willful conduct.

*Interference with HOME's Core Business Activities*

138. <u>Making Moves Program:</u> This program is funded by NY State's Enterprise Grant. This comprehensive housing mobility program, operated by HOME, assists families who receive Housing Choice Vouchers (HCV) in Buffalo and Erie County, NY, who wish to move to low poverty, well-resourced communities of their choice. These communities have been chosen based on how likely they are to promote healthy development for children. The children have access to better schools, neighborhood resources such as grocery stores, doctors, and safe playgrounds.

139. To participate in the Making Moves Program, families must have at least one

child under the age of 18 living in the household. Through this program, HOME provides comprehensive case management services to support voucher holders and serves as the primary point of contact on all housing search-related issues, including but not limited to:

    a.  Assistance paying for moving expenses, security deposits, and application fees for housing in well-resourced areas;

    b.  Workshops on various housing, financial, and wellness related topics;

    c.  Referral for credit counseling;

    d.  Individual counseling and support throughout the housing search process;

    e.  Assistance with completing the lease application and other required paperwork;

    f.  Post-move support and check-ins provided by the Mobility Coach; and

    g.  Landlord/Tenant liaison services and mediation services to resolve landlord-tenant conflicts.

140.  <u>Private Investigation and Enforcement:</u> For years, HOME has received grants and contracts to conduct investigations [such as that described in this Complaint] and enforce fair housing laws in Western New York. HOME has and still does operate under several grants and contracts to conduct this work. These grants and contracts include: HUD's Private Enforcement Initiative (PEI) Grants, Buffalo Niagara Association of Realtors Partnership, NY State's Enterprise Grant, and NY State's Housing Trust Fund Corporation Contract.

141.  Through these grants and contracts, HOME also provides free assistance to victims of housing discrimination by:

    a.  Recording and investigating reported incidences of discrimination;

    b.  Explaining legal rights and options;

    c.   Assisting in the resolution of validated complaints of housing discrimination through advocacy, conciliation, administrative complaints, or court action; and

    d.   Providing resource referrals and ongoing emotional support.

142.   <u>Education and Outreach:</u> HOME continues to receive various grants and contracts to provide educational outreach and fair housing presentations to meet the fair housing needs of the community. These grants and contracts include: HUD's Education and Outreach (EOI) Grant, HUD's Fair Housing Organizations Initiative Grant, local municipalities' Community Development Block Grants, Buffalo Urban Renewal Agency Agreement, and NY State Enterprise Grants.

143.   Through these grants and contracts, HOME hosts workshops for tenants and landlords; conducts educational outreach to partner organizations; and conducts other direct public education initiatives including newsletters, public presentations, community events, and social media campaigns.

*Frustration of HOME's Mission*

144.   Defendants' discriminatory conduct frustrates HOME's core mission of ensuring equal access to fair housing. Specifically, Defendants' practice of discriminating against families with children frustrates HOME's core mission by violating the federal fair housing law and the NY Human Rights Law that HOME seeks to enforce. Defendants' practice undermines, rather than advances, equal housing opportunities by making fewer housing units available to prospective renters regardless of their protected class status.

145.   HOME devoted considerable staff time and resources to efforts to identifying the nature and scope of Defendants' discriminatory conduct.

146.   But for Defendants' policy or practice of discriminating against families with

children, HOME could have focused its resources on previously scheduled programming and

activities. HOME was compelled to divert resources because Defendants' practices constitute

unlawful housing discrimination involving a substantial number of units.

*HOME's Counteraction Activities*

147.    HOME has committed, is committing, and will continue to commit scarce

resources to identify and counsel potential renters impacted by Defendants' unlawful

discriminatory policies or practices, investigate complaints, engage in education and outreach,

and develop and disseminate education materials to ameliorate the effects of Defendants'

discriminatory actions.

148.    Beginning in November 2022, and prior to the filing of this Complaint, HOME

diverted staff time and other scarce resources from regular activities (including HOME's fair

housing services and housing search assistance) to investigate and counteract Defendants'

discriminatory conduct.

149.    To counteract Defendants' discriminatory conduct, HOME devoted considerable

staff time and resources to identifying the nature and scope of Defendants' discriminatory

conduct and taking actions to mitigate its discriminatory impact. Prior to filing this action,

HOME devoted staff time and tester time to fully investigate these actions of unlawful

discrimination.

150.    The following are representative examples of its counteraction activities:

      a.    <u>Staff Time:</u> HOME staff members diverted their time to researching

occupancy standards and restrictions and the impact of familial status

discrimination in Western New York. This included sending staff to

attend specialized trainings on disparate impact, such as a HUD and

National Fair Housing Training Academy Conference in August 2023. HOME staff members consistently diverted their time from other responsibilities, such as drafting grant proposals, carrying out grant-related activities, and investigating other alleged violations of fair housing laws.

b.  Fair Housing Testing: HOME diverted eight trained testers to conduct follow-up tests in this case when they could have been conducting other tests throughout Western New York.

c.  Outreach to Partner Organizations: HOME staff has conducted over 185 outreach events over Western New York to distribute information about housing discrimination, including familial status discrimination, since October 2022. Outreach locations include family-friendly events at schools, parks, festivals, and organizations that serve members of the community likely to have children. At these events, HOME staff spoke to members of the community about fair housing and identified HOME as a resource for reporting housing discrimination. HOME maintains records of these events.

d.  Family-Specific Programming: HOME operates a special housing program called the Making Moves Program. It is specifically designed to support families with children by reducing barriers to accessing safe, affordable, discrimination-free housing for families with children. It is a voluntary housing mobility program that provides comprehensive case management services to help families find stable housing in well-

28

resourced areas in Western New York. Defendants' practices of discriminating against families with children directly undermines the effectiveness of the program. To qualify, adult participants must have at least one child under age 18.

e.  Direct Public Education: HOME has conducted a public education campaign in the form of newsletters and public service announcements, public presentations, and social media advertisements and posts. The following detail specific steps HOME has taken to counteract familial status discrimination through direct public education:

1.  *Newsletters and Public Service Announcements:* In Fall 2022, HOME published its 6th Edition Landlord Rights Guide, which includes a section on occupancy limits. Since then, HOME has distributed over 750 Landlord Rights Guides to housing providers in Western New York. In April 2024, HOME developed a "Toolkit for Renters" to help members of the community document their housing search. This toolkit provides home seekers with the ability to document their interactions with housing providers in the midst of their housing search. It also includes educational material on housing discrimination, including familial status discrimination, and how to report such instances to HOME.

2.  *Public Presentations:* In March 2023, April 2023, and August 2023, a HOME staff member conducted trainings for participants or prospective participants of the Making Moves Program on fair

housing, including familial status discrimination. Every member of the Making Moves Program has at least one child in their household, and therefore are vulnerable to familial status discrimination.

3. *Community Events:* On August 19, 2023, HOME staff members hosted HOME's Annual Community BBQ, where they provided information about housing discrimination to attendees. Prior to this event, staff members designed and planned public education materials to counteract the effects of Defendants' familial status discrimination. HOME's Community BBQ provides free backpacks and school supplies to families with children. Attendees were provided with information on their rights and how to report familial status discrimination. On August 24, 2024, HOME staff members hosted HOME's Annual Community BBQ, where they provided information about housing discrimination to attendees. Prior to this event, staff members designed and planned public education materials to counteract the effects of Defendants' familial status discrimination. Attendees were provided with information on their rights and how to report familial status discrimination.

4. *Social Media Campaign:* HOME posted a series of public service announcements to raise awareness of unlawful discrimination, including familial status discrimination. HOME posts across multiple social media platforms, including Facebook and Instagram. HOME maintains records of these posts.

## CAUSES OF ACTION

### COUNT I

**DISCRIMINATORY TREATMENT: FAMILIAL STATUS**

**FAIR HOUSING ACT, 42 U.S.C. § 3601 *et seq.***

**N.Y. HUMAN RIGHTS LAW, N.Y. EXEC. LAW § 290 *et seq.***

151.    Plaintiff realleges and incorporates by reference all foregoing allegations.

152.    Defendants' policy or practice of discriminating against families with children violates the FHA and the NY Human Rights Law because it discriminates against prospective renters based on their familial status.

153.    The FHA makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of . . . familial status." 42 U.S.C. § 3604(a).

154.    It is also unlawful to "represent to any person because of . . . familial status . . . that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available." 42 U.S.C. § 3604(d).

155.    The NY Human Rights Law makes it an "unlawful discriminatory practice" to "refuse to sell, rent, lease or otherwise to deny to or withhold from any person or group of persons such a housing accommodation because of the . . . familial status of such person or persons, or to represent that any housing accommodation or land is not available for inspection, sale, rental or lease when in fact it is so available." N.Y. Exec. Law § 296(5)(a)(1).

156.    The NY Human Rights Law also prohibits "discriminat[ion] against any person because of . . . familial status in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or in the furnishing of facilities or services in connection

therewith." N.Y. Exec. Law § 296(5)(a)(2).

157.   Defendants' refusal to rent to families with children is unlawful discrimination based on their familial status in violation of 42 U.S.C. § 3604(a), (d) and N.Y. Exec. Law § 296(5)(a)(1)–(2).

158.   Defendants' discrimination against families with children constitutes disparate treatment based on familial status in several ways:

   a.   Defendants' policy or practice of screening out prospective renters with children and refusing to follow up is disparate treatment against families with children;

   b.   Defendants' policy or practice of not allowing prospective renters with children to tour available apartments is disparate treatment of families with children;

   c.   Defendants' policy or practice of discouraging prospective renters with children by telling them that Defendants' buildings are "not suited for children" and that, "[t]hese are all buildings of professional adults. It's not a family setting" is disparate treatment of families with children;

   d.   Defendants' policy or practice of discouraging prospective renters with children by telling them that BMG does not "get many family groups of people looking for apartments in buildings that cater to young professionals . . . there's no children in these buildings . . . There's no yard. There's no way for children from another address to approach your children. . . I don't know what you would do with children [here]" is disparate treatment of families with children;

   e.   Defendants' policy or practice of discouraging prospective renters with children by telling them that, "I don't know what you would do with children there. You'd have to take them with you when you go in and out. I've been doing this for 40+

years. We've owned the Elliott for 30+ years. We've never had a child in it. There's three buildings: the Mayflower, the Elliott, and the Bryant. These are all buildings of professional adults. It's not a family setting" is disparate treatment of families with children; and

f.   Defendants' policy or practice of discouraging prospective renters with children or steering them away from Defendants' Medical Corridor apartment buildings by telling them that they "know what [prospective renters] need . . . a nice flat or apartment, maybe like a 2-family, a home-like setting" is disparate treatment of families with children.

159.   Defendants' discriminatory behavior has interfered with Plaintiff's core business activities and frustrated Plaintiff's mission by subjecting families with children to unlawful discrimination. Additionally, Defendants' actions have caused Plaintiff to divert substantial time and resources from its usual activities to detecting, investing, and counteracting Defendants' unlawful conduct. Accordingly, Plaintiff has been injured by Defendants' discriminatory conduct and has suffered damages as a result.

160.   Defendants' conduct was intentional, willful, and made in reckless disregard of the known rights of others.

## COUNT II

### UNLAWFUL STEERING: FAMILIAL STATUS
### FAIR HOUSING ACT, 42 U.S.C. 3601 *et seq.*
### N.Y. HUMAN RIGHTS LAW, N.Y. EXEC. LAW § 290 *et seq.*

161.   Plaintiff realleges and incorporates by reference all foregoing allegations.

162.   Defendants' policy or practice of attempting to influence, redirect, or steer

prospective renters with children to different neighborhoods outside the Medical Corridor violates the FHA and the NY Human Rights Law because it subjects families with children to disparate treatment based on their familial status.

163.    Under the FHA, it is "unlawful, because of . . . familial status . . . to restrict or attempt to restrict the choices of a person by word or conduct in connection with seeking, negotiating for, buying or renting a dwelling so as to perpetuate, or tend to perpetuate, segregated housing patterns, or to discourage or obstruct choices in a community, neighborhood or development." 24 C.F.R. § 100.70(a).

164.    Prohibited actions, considered unlawful steering practices, include, but are not limited to "discouraging any person from inspecting, purchasing or renting a dwelling because of . . . familial status . . . or because of the . . . familial status . . . of persons in a community, neighborhood or development" and "communicating to any prospective purchaser that he or she would not be comfortable or compatible with existing residents of a community, neighborhood or development because of . . . familial status" 24 C.F.R. § 100.70(c)(1)-(c)(3).

165.    Under the NY Human Rights Law, it is an "unlawful discriminatory practice" to "refuse to sell, rent, lease or otherwise to deny to or withhold from any person or group of persons such a housing accommodation because of the . . . familial status of such person or persons." N.Y. Exec. Law § 296(5)(a)(1).

166.    Defendants' attempt to influence prospective renters with children to rent units in specific units and restrict their ability to tour and rent from specific apartments is unlawful discrimination based on their familial status in violation of 42 U.S.C. 3601, 24 C.F.R. § 100.70(c)(1)–(c)(3), and N.Y. Exec. Law § 296(5)(a)(1)–(2).

167.    Defendants' discrimination against families with children constitutes unlawful

steering based on familial status in several ways:

    a.  Defendants' policy or practice of screening out prospective renters with children and refusing to return telephone calls is disparate treatment against families with children and is unlawful steering;

    b.  Defendants' policy or practice of not allowing prospective renters with children to tour available apartments is disparate treatment against families with children and is unlawful steering;

    c.  Defendants' policy or practice of telling prospective renters with children that Defendants' buildings are "not suited for children" and that "[t]hese are all buildings of professional adults. It's not a family setting," is disparate treatment against families with children and is unlawful steering;

    d.  Defendants' policy or practice of telling prospective renters with children that BMG does not "get many family groups of people looking for apartments in buildings that cater to young professionals . . . there's no children in these buildings . . . There's no yard. There's no way for children from another address to approach your children. . . I don't know what you would do with children [here]" is disparate treatment against families with children and is unlawful steering;

    e.  Defendants' policy of telling prospective renters with children that, "I don't know what you would do with children there. You'd have to take them with you when you go in and out. I've been doing this for 40+ years. We've owned the Elliott for 30+ years. We've never had a child in it. There's three buildings: the Mayflower, the Elliott, and the Bryant. These are all buildings of professional adults. It's not a

family setting," is disparate treatment against families with children and is
unlawful steering; and

    f.   Defendants' policy or practice of telling prospective renters with children that
they "know what [prospective renters] need . . . a nice flat or apartment, maybe
like a 2-family, a home-like setting" is disparate treatment against families with
children and is unlawful steering.

168.   Defendants' discriminatory behavior has interfered with Plaintiff's core business
activities and frustrated Plaintiff's mission by subjecting families with children to unlawful
discrimination. Additionally, Defendants' actions have caused Plaintiff to divert substantial time
and resources from its usual activities to detecting, investing, and counteracting Defendants'
unlawful conduct. Accordingly, Plaintiff has been injured by Defendants' discriminatory conduct
and has suffered damages as a result.

169.   Defendants' conduct was intentional, willful, and made in reckless disregard of
the known rights of others.

## COUNT III

### DISPARATE IMPACT: FAMILIAL STATUS and SEX
### FAIR HOUSING ACT, 42 U.S.C. 3601 *et seq.*

170.   Plaintiff realleges and incorporates by reference all foregoing allegations.

171.   Defendants' discriminatory policies have a disparate impact on two protected
classes: (1) families with children and (2) female-headed households (basis of sex).

172.   Defendants' explicit policy or practice of excluding prospective renters with
children from their rental units constitutes both disparate treatment and has an unlawful disparate

impact on families with children. Logically, disparate treatment on the basis of how many children are in a household (see Count I) also has a disparate impact on families with children.

173.    Additionally, Defendants' policy or practice of excluding prospective renters with children has an unlawful disparate impact based on sex because it affects female-headed households substantially more than male-headed households.

174.    FHA liability may be established based on either or both of two separate and distinct theories of discriminatory effect: a defendant's policy or practice (1) "actually or predictably results in a disparate impact on [an FHA-protected group]," 24 C.F.R. § 100.500 (Count III) or (2) "perpetuates segregated housing patterns," 24 C.F.R. § 100.500 (Count IV); *see also MHANY Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 619–20  (2d Cir. 2016) (citing *Huntington Branch, NAACP v. Huntington*, 844 F.2d 926, 937 (2d Cir. 1988)).

175.    Discriminatory intent is not required to establish liability for disparate impact under the FHA. 24 C.F.R. § 100.500.

176.    Defendants have a practice of screening out, discouraging, refusing to rent, or otherwise making housing unavailable to families with children.

177.    Each of the ways that Defendants discriminate against families with children constitutes a policy or practice of discriminating against families with children that have a disparate impact on families with children and female-headed households (basis of sex):

     a.    Defendants' policy or practice of screening out prospective renters with children and refusing to follow up has a disparate impact on families with children and female-headed households;

     b.    Defendants' policy or practice of not allowing prospective renters with children to tour available apartments has a disparate impact on families with children and

female-headed households;

c.  Defendants' policy or practice of telling prospective renters with children that Defendants' buildings are "not suited for children" and that, "[t]hese are all buildings of professional adults. It's not a family setting," has a disparate impact on families with children and female-headed households;

d.  Defendants' policy or practice of telling prospective renters with children that BMG does not "get many family groups of people looking for apartments in buildings that cater to young professionals . . . there's no children in these buildings . . . There's no yard. There's no way for children from another address to approach your children. . . I don't know what you would do with children [here]," has a disparate impact on families with children and female-headed households;

e.  Defendants' policy of telling prospective renters with children that, "I don't know what you would do with children there. You'd have to take them with you when you go in and out. I've been doing this for 40+ years. We've owned the Elliott for 30+ years. We've never had a child in it. There's three buildings: the Mayflower, the Elliott, and the Bryant. These are all buildings of professional adults. It's not a family setting," has a disparate impact on families with children and female-headed households; and

f.  Defendants' policy or practice of telling prospective renters with children that they "know what [prospective renters] need . . . a nice flat or apartment, maybe like a 2-family, a home-like setting," has a disparate impact on families with children and female-headed households.

178.    In the Buffalo-Cheektowaga Metropolitan Area, there were 497,529 occupied housing units, and, within those, 125,177 family households with children under the age of 18 in the U.S. Census Bureau's American Community Survey (ACS) 5-Year Estimates 2018-2022 (Table A10009).  Of those households with children under 18 years of age, 77,316 (62%) were married-couple family households, 11,682 (9%) were single-parent households led by a man, and 36,179 (29%) were single-parent households led by a woman. (**Figure 1.**)

179.    Defendants' policy or practice has a discriminatory impact on households with a female head of household. Defendants' policy or practice predictably and actually disproportionately harms female heads of household (*i.e.* disproportionately affects women) because households with children in the Buffalo Metropolitan Area are more likely to have a female head of household than the relevant non-protected group, households without a female-headed household. Among single-parent households, a policy excluding households with children adversely affects women at **three (3.0) times the rate** than it affects men, a difference that is statistically significant using a t-test.

180.    Defendants' policy or practice does not have a substantial, legitimate, nondiscriminatory objective and rather is an artificial, arbitrary, and unnecessary barrier for families with children and female-headed households. Even if Defendants' policy or practice were to have some business purpose, less discriminatory alternatives are and have been available to Defendants to achieve those objectives.

181.    Defendants' discriminatory behavior has interfered with Plaintiff's core business activities and frustrated Plaintiff's mission by subjecting families with children to discrimination. Moreover, Defendants' discriminatory actions have caused Plaintiff to divert substantial time and resources from its usual activities to detecting, investing, and counteracting Defendants' unlawful

conduct. Accordingly, Plaintiff has been injured by Defendants' discriminatory conduct and has suffered damages as a result.

182.    Defendants' conduct was intentional, willful, and made in reckless disregard of the known rights of others.

**Figure 1.**



## COUNT IV

**PERPETUATION OF SEGREGATION: FAMILIAL STATUS
FAIR HOUSING ACT, 42 U.S.C. 3601 *et seq.***

183.    Plaintiff realleges and incorporates by reference all foregoing allegations.

184.    The Fair Housing Act prohibits discriminatory conduct that perpetuates or furthers segregation based on any FHA-protected class.

185.    Defendants' policy or practice of discriminating against families with children has the effect of perpetuating residential segregation by familial status in the Buffalo metropolitan region.

186.    FHA liability may be established based on either or both of two separate and distinct theories of discriminatory effect: a defendant's policy or practice (1) "actually or predictably results in a disparate impact on [an FHA-protected group]," 24 C.F.R. § 100.500 (Count III) or (2) "perpetuates segregated housing patterns," 24 C.F.R. § 100.500 (Count IV); *see also MHANY Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 619–20 (2d Cir. 2016) (citing *Huntington Branch, NAACP v. Huntington*, 844 F.2d 926, 937 (2d Cir. 1988)).

187.    Discriminatory intent is not required to establish liability for perpetuation of segregation under the FHA. 24 C.F.R. § 100.500.

188.    Congress passed the FHA to combat arbitrary barriers to integrated housing. A decision, policy, or practice that perpetuates segregation in housing based on a protected class contravenes the FHA, 42 U.S.C. § 3604(a); 24 C.F.R. § 100.500(a).

189.    In this case, patterns of familial segregation have and still do exist in the Census Tracts where Defendants' properties are located.

190.    Defendants' practices predictably and actually maintain, perpetuate, reinforce, or otherwise perpetuate created a segregated familial housing pattern.

191.    Defendants' practices forestall familial housing integration and freeze existing segregation patterns.

192.    The characteristics of the two Census Tracts containing the properties at issue in this case are substantially different from the Buffalo-Cheektowaga Metropolitan Area as a whole, the relevant rental market. In the two Census Tracts (006702 and 006602) in which Defendants' properties are located, only 10 percent of households have children under the age of 18, according to the U.S. Census Bureau's American Community Survey (ACS) 5-Year Estimates 2018-2022 (Table A10009). By comparison, in the Buffalo-Cheektowaga Metropolitan Area, **two and one-half (2.5) times** as many households (twenty-five percent) have children under the age of 18, according to the U.S. Census Bureau's ACS 5-Year Estimates 2018-2022 (Table A10009). (**Figure 2.**)

193.    The difference between the Census Tracts in which the Defendants' properties are located and the greater Buffalo-Cheektowaga Metropolitan Area is statistically significant, using a t-test.

194.    This pattern demonstrates that Defendants' practices of discouraging, denying, and otherwise making housing unavailable to families with children in those Census Tracts unlawfully perpetuates and reinforces a segregation pattern that (1) reduces the overall presence of families with children in the relevant Census Tracts, relative to the rental market as a whole, and (2) reduces the presence of families with children in the individual buildings within the Census Tracts. This predictably and actually results in the segregation of people based on protected class status—familial status—in violation of the Fair Housing Act.

195.    Defendants' properties are highly desirable to renters who seek the amenities available in the Medical Corridor. The properties are located in high-opportunity neighborhoods

convenient for burgeoning families with easy access to numerous neighborhood resources such as hospitals, medical research facilities, public transit, restaurants, a grocery store, public parks, entertainment, and other public accommodations.

196.    The desirability of such amenities is not limited to single adults, adult couples, or other households without children. Families with children have the legal right to access these rental properties on the same terms without being subject to discrimination, regardless of Defendants' preference to market to "professionals" in the Medical Corridor. "Professionals" also includes adults with children.

197.    By applying Defendants' practices to families with children, Defendants act as gatekeepers, preventing such resources from being easily accessible to families with children.

198.    Defendants' practices predictably and actually perpetuate familial segregation in violation of the FHA.

199.    Defendants' practices do not have a substantial, legitimate, nondiscriminatory objective. Even if the practice were to have a business purpose, less discriminatory alternatives are and have been available to Defendants to achieve those objectives.

200.    Defendants' discriminatory behavior has interfered with Plaintiff's core business activities and frustrated Plaintiff's mission by subjecting families with children to discrimination. Moreover, Defendants' discriminatory actions have caused Plaintiff to divert substantial time and resources from its usual activities to detecting, investing, and counteracting Defendants' unlawful conduct. Accordingly, Plaintiff has been injured by Defendants' discriminatory conduct and has suffered damages as a result.

201.    Defendants' conduct was intentional, willful, and made in reckless disregard of the known rights of others.

**Figure 2.**



Percentage of Households with Children Under Age 18. Defendants' Properties: 10%. Buffalo-Cheektowaga Metropolitan Area: 25%.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that judgment be entered against Defendants as follows:

a. Declaring that Defendants' acts, policies or practices, and statements related to Defendants' rental policies or practices toward families with children willfully violated the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, and the NY Human Rights Law, NY Exec. Law § 290 *et seq.*

b. Permanently enjoining Defendants and their agents, subsidiaries, affiliates, employees, successors, and all other persons in active concert or participation with them, from discriminating on the basis of familial status;

c. Requiring Defendants and their agents, subsidiaries, affiliates, employees, successors, and all other persons in active concert or participation with them, to develop and implement policies, practices, and procedures that do not

discriminate against persons protected by federal fair housing laws and the laws

of New York;

d.  Awarding Plaintiff all available monetary damages in an amount to be determined

at trial, including, but not limited to, compensatory damages, as well as punitive

damages in an amount that would punish Defendants for the willful, wanton, and

reckless conduct alleged herein, and that would effectively deter similar conduct

in the future;

e.  Awarding Plaintiff reasonable attorney's fees and costs; and

f.  Awarding such other relief as the Court deems just and proper.

## JURY TRIAL

Plaintiff requests trial by jury as to all issues in this case.

Dated: _____                    Respectfully submitted,

                                           /s/ _____

                                           Heather R. Abraham
                                           Mia Forney, *Student Attorney*[*]
                                           Nicia Bottini Morales, *Student Attorney*[*]
                                           Civil Rights and Transparency Clinic
                                           University at Buffalo School of Law
                                           507 O'Brian Hall, North Campus
                                           Buffalo, NY 14260
                                           (716) 645-2073
                                           habraham@buffalo.edu

                                           Daniel Corbitt
                                           Housing Opportunities Made Equal, Inc.
                                           135 Delaware Avenue, Suite 501
                                           Buffalo, NY 14202
                                           (716) 854-1400, ext. 21
                                           dcorbitt@homeny.org

                                           *Attorneys for Plaintiff*

                                           [*]*Pending court approval for student practice*